## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT E. JACKSON, | ) | |
| Plaintiff, | ) | 14 cv 2197 |
| v. | ) | |
| N'GENUITY ENTERPRISES, CO. | ) | Judge Joan |
| And ALFRED BOWEN, | ) | Humphrey Lefkow |
| Defendants. | ) | |

## PLAINTIFF'S EXPEDITED MOTION FOR PRELIMINARY INJUNCTION AND APPOINTMENT OF A RECEIVER

Plaintiff Vincent E. Jackson ("Plaintiff" or "Mr. Jackson") through the undersigned attorneys and pursuant to Fed. R. Civ. P. 65 seeks a Preliminary Injunction Order against Defendants N'Genuity Enterprises, Co. ("N'Genuity") and Alfred Bowen ("Defendant Bowen") enjoining Defendants from diluting or divesting Plaintiff's ownership interest in N'Genuity. Pursuant to Fed. R. Civ. P. 66, Plaintiff also requests the appointment of a Temporary Receiver over the corporate defendant N'Genuity Enterprises. In support thereof, Plaintiff states as follows:

### I. INTRODUCTION

The insider self-dealing that plagued N'Genuity and generated years of litigation before this Court in *Jackson v. N'Genuity,* 09cv6010 *("N'Genuity I"),* and then in an Arizona Bankruptcy Court, *In re N'Genuity,* 2:11 bk 28705, continues to date. Despite Jackson's legitimate and repeated requests, Defendants refused to produce an electronic copy of N'Genuity's QuickBooks (the electronic software program containing N'Genuity's accounting records). On May 20, 2014, this Court ordered N'Genuity to produce its QuickBooks. [Dkt. #34.] N'Genuity complied. A review of the QuickBooks explains why N'Genuity rebuffed Jackson's requests: Since the date of the confirmation of N'Genuity's Bankruptcy Plan (April 4, 2012) N'Genuity has paid its insiders and their entities over $1.5 million dollars. Since Confirmation, N'Genuity paid Defendant Bowen (directly and through UAE, a company solely owned by Bowen) approximately $330,000 and, of that amount, paid him $206,127.58 since December 20, 2013, the date that

N'Genuity thought was the last inspection of its records.[1] N'Genuity will allege that its payments to Defendant Bowen are a legitimate marketing expense. They are not. Rather they are yet another attempt by N'Genuity to prevent Jackson from obtaining the benefit of his 49% equity interest in the company.

In fact, defending the payments to Bowen as a legitimate marketing expense defies common sense and the evidence set forth below. For example, since Confirmation, N'Genuity has paid Dustin and Chad Bowen (Defendant Bowen's sons) $844,781.20 for "marketing" – the same justification that N'Genuity uses to pay Bowen. And, despite an expenditure of over $1.1 million in marketing to the Bowens, N'Genuity has not seen any increase in revenues. Indeed, revenues have plummeted. For the first time since 2004, N'Genuity reported operating at a loss (this loss was coincidently reported at the same time that Jackson and N'Genuity engaged in a court recommended settlement discussion regarding a buyout of Jackson's 49% interest). In any case, the N'Genuity – UAE agreement is the result of a conflicted director transaction. Littlechief signed the contract on behalf of N'Genuity and her husband, Defendant Bowen, signed on behalf of UAE. The contract to pay UAE hundreds of thousands of dollars for marketing (in addition to the hundreds of thousands of dollars already being paid to Dustin and Chad Bowen for marketing) is not fair to N'Genuity. Moreover, N'Genuity and UAE do not appear to be following the terms of the agreement. In other words, N'Genuity, through Bowen, pays these individuals and entities the amounts it wants, when it wants. N'Genuity's entry into a marketing contract with Defendant Bowen seems inappropriate given Bowen's formation of N'Genuity Food Exports in March 2013. N'Genuity Food Exports appears to *directly compete* with Defendant N'Genuity, a food export company. Finally, there is no evidence to support the work allegedly performed by UAE or Alfred Bowen. Despite repeated requests by Simon Consulting - an Arizona based forensic accounting company charged with conducting inspections of N'Genuity post-confirmation, neither N'Genuity nor UAE produced even a single sheet of paper (or other evidence) to support N'Genuity's payments to Bowen or UAE.

---

[1] Prior to the May 27, 2014 QuickBooks, Jackson estimated that N'Genuity paid Defendant Bowen approximately $98,000 since confirmation – a far cry from the $331,652.59. See, Dkt. #29-2, p.1.

Recently discovered information confirms that Defendant Bowen is in *de facto* control of N'Genuity. Indeed, when Dustin Bowen (one of N'Genuity's directors and Defendant Bowen's son) was asked by Jackson's inspectors why he had directly paid Defendant Bowen $2,675 (in addition to paying Defendant Bowen through UAE), Dustin essentially stated, "because he told me to." Since Defendant Bowen has been managing N'Genuity (something the company is paying Littlechief to do), Defendant Bowen has also made payments to creditors of IMG (which it cannot pay because it is in bankruptcy) and directly to Littlechief's mother. Indeed, N'Genuity's counsel (Gallagher & Kennedy) even filed a motion to dismiss on behalf of Defendant Bowen even though counsel did not file an appearance to represent Bowen, alleged that Bowen was not a director of N'Genuity and denied that N'Genuity paid him to do so. Such benevolent "pro bono" work confirms that Defendant Bowen is running N'Genuity, the company that has paid Gallagher & Kennedy $993,850.33 since confirmation alone.

Between 2008 and 2012, N'Genuity's annual revenues were always at or slightly above $30 million. In 2013, the year Defendant Bowen created N'Genuity Food Exports -- and one year after he created UAE, N'Genuity's gross revenues fell to $22 million. On April 22, 2014, N'Genuity's counsel indicated it faced the possibility of filing for Chapter 7 Bankruptcy. (Ex. P, pp. 26-27.) Falling revenues and court oversight have done nothing to stem the self-dealing that occurred pre-bankruptcy and is now occurring post-confirmation. Defendants even abandoned N'Genuity's offices and moved to a new space without telling its 49% shareholder, Mr. Jackson. It was not until Jackson attempted to serve N'Genuity with the Complaint in this matter, that he learned the company moved.

For these reasons, and as set forth more fully below, Jackson also seeks the appointment of a Receiver. The lengths to which N'Genuity went to keep its QuickBooks from Jackson, the alarming amount of money funneled to Defendant Bowen while the company is allegedly experiencing significant drops in revenue, and N'Genuity's threats to file Chapter 7 bankruptcy warrant the oversight of a receiver. Not only will a receiver ensure the financial health of N'Genuity but will hopefully stem litigation fees as well.

## II. FACTUAL BACKGROUND

This Court is familiar with the factual and procedural background of Jackson's 2009 lawsuit against Defendants Bowen and N'Genuity (*Jackson v. N'Genuity, et. al,* 09 cv 6010, hereinafter "*N'Genuity I*"), which were set forth in Magistrate Judge Cole's October 3, 2011 order granting Jackson's request for injunctive relief and appointing a receiver over N'Genuity.  (Ex. A, *Jackson v. N'Genuity,* 2011 U.S.Dist. LEXIS 113511.) The substance of that lawsuit was that Bowen, his wife Valerie Littlechief ("Littlechief") (the 51% shareholder of N'Genuity), Bowen's son, Dustin Bowen[2] ("Dustin"), and their entities, misappropriated N'Genuity's profits under the guise of doing business with entities that Littlechief and Dustin owned or controlled.   At the preliminary injunction phase of the proceedings, this Court was concerned enough to appoint a receiver and enjoin further self-dealing.   On the eve of this Court naming a receiver, (October 11, 2011) N'Genuity filed a Chapter 11 Bankruptcy Petition in the United States Bankruptcy Court, District of Arizona thereby triggering an automatic stay and preventing the appointment of a receiver.   *In re N'Genuity,* Case No. 2:11 bk 28705.

Immediately following the bankruptcy filing, N'Genuity resumed the payments to insiders, including cash advances to Littlechief and payments to Dustin's company Impact Marketing Group ("IMG"); conduct specifically enjoined by this Court.  Jackson sought dismissal of N'Genuity's bankruptcy, or alternatively, for the appointment of a Chapter 11 Trustee.[3]  *In re N'Genuity,* Dkt. #27.

---

[2]  Dustin Bowen was made a director of N'Genuity without Jackson's vote in 2009 and has subsequently been made a director of N'Genuity – a position he still occupies.

[3]  Jackson also sought to disqualify Gallagher & Kennedy   ("G&K") (N'Genuity's bankruptcy counsel), in part, because G&K received funds in violation's of this Court's TRO (the order that preceded the October 3, 2011 preliminary injunction).[3]  Through the Declaration of Attorney Mark Deathrage, G&K's response essentially admitted that it had violated this Court's TRO by applying a $15,470.26 "overpayment" from N'Genuity to GFI's account (one of the entities owned by Dustin Bowen).  *See* Ex. D, ¶¶ 6-8.  In Deathrage's declaration, he states:

> 21. It is disappointing that Judge Cole used my Declaration to draw the inferences and conclusions set forth on pages 26-30 of the Opinion and Order.  If he had issued an Order directing Gallagher & Kennedy to provide more detailed information, and identifying his concerns with the Declaration we could and would have responded with any and all the information set forth herein.

(Ex. D, ¶21.) Ironically, to date and despite repeated requests from Jackson, G&K has never produced its pre-petition invoices to support Deatherage's declaration. Judge Nielsen denied Jackson's Motion to Disqualify G&K.

On November 30, 2011, the Bankruptcy Court denied Jackson's motion to dismiss without prejudice but granted his request for the appointment of a Trustee. (Ex. C.) The Bankruptcy Court adopted Judge Cole's preliminary injunction ruling with the exception of the appointment of a temporary receiver; a need obviated by the appointment of a Chapter 11 Bankruptcy Trustee. *Id.* ¶2.

On December 2, 2011, the Bankruptcy Court appointed Michael W. Carmel as the Trustee ("Trustee"). Upon assuming operational control of N'Genuity, the Trustee hired Littlechief and Dustin Bowen and deemed both Chad Bowen and Alfred Bowen as "not essential to operations". (Ex. E, ¶12(a) and (b).) The Trustee hired Michelle Michaud, a former employee, to assist in the operation of N'Genuity. (Ex. E, ¶10.) Concerned for her safety, Ms. Michaud resigned effective January 2, 2012. (Ex. E, ¶16.) Subsequently, the Trustee determined that Chad Bowen's services would be beneficial. (Ex. E, ¶7.) The Trustee refused to hire Impact Marketing Group (IMG) - N'Genuity's alleged sales and marketing arm owned by Dustin and Chad Bowen and allegedly entitled to, pursuant to a conflicted director transaction, 5% of N'Genuity's *gross sales* as a "commission". (Ex. E, ¶6.)

Jackson had no desire to destroy a company of which he owned 49%. He worked with the Debtor to obtain a plan that ensured the business' survival while also allowing Jackson the ability to pursue his 2009 claims and monitor the business. Thus, on March 27, 2012, Jackson and N'Genuity entered into a stipulation to confirm N'Genuity's First Amended Plan of Reorganization. (Ex. F.) The Plan called for the termination of the Trustee. To ensure outside financial oversight of N'Genuity, pursuant to the stipulation, the parties agreed that N'Genuity would permit Simon Consulting ("Simon") to inspect its books and records on a monthly basis pending final consummation of the Plan or further order of the bankruptcy court. (Ex. F, ¶3.) IMG's contract was rejected under the N'Genuity's bankruptcy plan. Dustin and Chad Bowen (IMG's owners) were instead paid, respectively, $180,000 and $120,000 for the first year after the bankruptcy for their sales and marketing work. In addition, Valerie Littlechief would receive $240,000 as a salary for the first year following plan confirmation. (Although these are not small numbers, they were substantial reductions in the compensation that these individuals had received pre-bankruptcy.) Under the stipulation withdrawing Jackson's objections to

N'Genuity's bankruptcy plan, N'Genuity agreed that Jackson would have the right to inspect N'Genuity's financial information on a monthly basis post-confirmation. On April 4, 2012, the Bankruptcy Court approved N'Genuity's bankruptcy plan and incorporated the terms of Jackson's stipulation resolving his confirmation objections as part of N'Genuity's plan.

Between October 31, 2012 and February 25, 2013, Jackson's 2009 claims against N'Genuity were tried before the Honorable George B. Nielsen in the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"). On October 28, 2013, the Bankruptcy Court ruled and had this to say about N'Genuity's CEO and director, Valerie Littlechief:

> it is clear she [Littlechief] does not actually function as the president and chief executive officer of N'Genuity, other than in name. Contrary to her filed declaration, she is not " . . . thoroughly familiar with all aspects and operations of N'Genuity, including day-to-day operations, business affairs, books and records, and all rules and regulations . . ." applicable to this company. Her appalling failure to ensure that contemporaneous records were created to clarify and bring transparency to the dizzying mass of transfers of company cash to her, her personal creditors, family members and insider third parties largely created the crisis with the minority shareholder. During her watch, a mysterious loss of company records and documents occurred, contributing both to the alarm of the minority shareholder and to subsequent adverse rulings and sanctions from the Chicago District Court. Her lack of knowledge about the basic affairs of this relatively small, closely held company results in this court not being able to give credence to her assertions Mr. Jackson was fully informed as to events and that company books were always open to him.

(Ex. B, pp., 30-31.) With respect to Dustin Bowen, the Bankruptcy Court observed:

> Like the ostensible President and CEO, this witness also evidences a woeful lack of knowledge of the routine financial and accounting records and procedures of the company. Yet he is functionally the operations person. Whoever actually directs or is at least responsible for the financial affairs of the debtor was not called as a witness by any party. They should have been. Given Dustin's professed lack of knowledge of such information and extreme, although understandable family partisanship, this fact finder cannot grant him credibility in financial matters, including those of his own entities.

(Ex. B, p. 49.) With respect to N'Genuity, the Bankruptcy Court found:

> [N'Genuity] through the action and inaction of Chief Executive Officer and Director LittleChief and other parties, formally or informally in control of the entity, engaged in conflicted transactions, failed to establish basic business accounting controls and meet basic standards for making and retaining accurate financial business records necessary for an appropriate understanding of debtor's financial transactions, all to the prejudice and injury of the minority equity holder Jackson.

and:

> This fact finder is absolutely convinced debtor [N'Genuity] through its insiders worked a significant harm and appreciable injustice on the minority shareholder by their actions and failure to act regarding financial management, record keeping and undisclosed insider transactions.

(Ex. B, pp. 98, 101.)

Consistent with N'Genuity's performance before this Court, the Bankruptcy Court found the following:

> [N'Genuity's] evidentiary case was marred by incredible testimony or claims of lack of knowledge from insider officers who should know, often conflicting with debtor's own business books and records as well as with documents produced by independent professionals it employed. Its failure to explain away conflicted transactions was heightened by the insider entity on the other side of the transaction likewise being unable to produce credible, contemporaneous records. It is impossible for this fact finder to accept that insiders and their entities that were paid hundreds of thousands, if not millions of dollars are unable to produce basic documentation of what they did. The company was unable to present a single knowledgeable witness to explain what was happening at the company and why it happened in the manner it did. Debtor's expert trial witness was compromised by her reliance on unsupported hearsay from conflicted insiders as one of her primary information sources for her report.

(Ex. B, pp. 98-99.) The Bankruptcy Court concluded that it was "absolutely convinced debtor through its insiders worked a significant harm and appreciable injustice on the minority shareholder by their actions and failure to act regarding financial management, record keeping and undisclosed insider transactions. This finding and conclusion does not give this court license to impose unlimited sanctions and damage awards, however." *Id.* at p. 101. Ultimately, the Bankruptcy Court undid N'Genuity's purported dilution of Jackson's 49% shareholder interest and awarded Jackson $500,000 in compensatory damages, and Jackson his attorneys' fees. *Id.* at pp. 102-104. Jackson filed a motion to

reconsider the amount of the award that the Bankruptcy Court denied on March 21, 2014. That matter is now pending on appeal before the Arizona District Court.

Post-Confirmation and despite the Plan's provision to pay Dustin and Chad Bowen $300,000 per year to perform N'Genuity's sales and marketing services, in April 2012, N'Genuity entered a new "contract" with Defendant Bowen (Dustin and Chad's father) to perform sales and marketing work for N'Genuity. This contract was not approved by any non-conflicted director or shareholder of N'Genuity. When Jackson's initial inspections uncovered this transaction (among others), N'Genuity retreated to its familiar pattern of not cooperating with Jackson's requests for information. Post-confirmation, Jackson twice had to seek Bankruptcy Court assistance to obtain the inspections that N'Genuity agreed to in the confirmation stipulation. (Ex. Y and Z.) When the agreed to inspection period expired Jackson had to seek this Court's assistance to obtain N'Genuity's accounting data stored in its QuickBooks.

The inspections and N'Genuity's recently produced QuickBooks data reveal that N'Genuity's pre-petition practices continued after the bankruptcy. As a result of Defendants continued post-bankruptcy misconduct, Mr. Jackson has filed a new cause of action [Dkt. #1] and seeks the appointment of a receiver and an injunction barring Defendants and anyone on their behalf, from:

(1) Taking any action that dilutes or divests Jackson's ownership interest in N'Genuity;
(2) Paying, lending or transferring any of N'Genuity's funds or assets to Defendant Bowen;
(3) Merging, paying, lending or transferring any of N'Genuity's funds or assets to any business entity, including without limitation UAE and N'Genuity Food Exports, in which Defendant Bowen or any his family members or relatives have any ownership interest, position or other affiliation; and
(4) Using N'Genuity funds to pay for the legal defense of Alfred Bowen in this or any other matter.

### III. FACTS NECESSITATING ISSUANCE OF AN INJUNCTION

**A. N'Genuity improperly paid Bowen, his entities, and his family members.**
**1. Payments to UAE and Bowen.**

The purported N'Genuity/UAE contract was not approved by a non-conflicted director or shareholder. N'Genuity and UAE entered an agreement on April 13, 2012, just days after the departure of the Trustee who had specifically barred N'Genuity from

making any payments to Bowen. N'Genuity, through Littlechief, entered into this contract to pay UAE $2,500 biweekly and paid UAE *before* UAE was even incorporated on April 30, 2012. (Ex. G, pp.75-79, Ex. CC). Prior to N'Genuity producing the court mandated QuickBooks on May 27, 2014, Jackson was lead to believe that N'Genuity was paying Defendant Bowen's UAE approximately $5,000 month, and based on the most recent report submitted by Simon, concluded that N'Genuity had paid it at least $98,600. (Ex. G, pp. 12, 44-45, 57, 66, 71, 88-89, 102-103; and see Dkt. #29-2, pp. 2 and 7-10.) The court mandated QuickBooks show, however, that N'Genuity has paid UAE at least $302,044. (Ex. DD, ¶13.) Of that amount, N'Genuity paid UAE $186,643.63 since the date of Simon's last inspection on December 3, 2013. (Ex. DD.)[4] To say that these payments are problematic is an understatement.

First, there is absolutely no legitimate business purpose in N'Genuity paying Defendant Bowen anything, let alone $302,043.63, through UAE to do its marketing. According to N'Genuity, Bowen's sons allegedly perform this marketing service. Prior to the production of the Court mandated QuickBooks, N'Genuity reported that it paid Bowen's sons $300,000 annually for this service. (Ex. G, passim.) The QuickBooks, however, show that since April 4, 2012, N'Genuity paid Bowen's sons $844,781for "marketing" while simultaneously paying Defendant Bowen $302,044 for this same service. (Ex. DD, ¶¶17,20.)

Second, UAE does nothing. Simon Consulting specifically asked N'Genuity to provide it with evidence of what UAE does. N'Genuity refused to comply with this request (presumably because it could not). (Ex. G, pp. 88-89.) UAE is not a legitimate company; Defendant Bowen admits that "nobody" maintains UAE's books and records, (Ex. H, p. 148.) The fact that N'Genuity's revenues have plummeted since it started paying UAE further demonstrates that UAE is not a legitimate business expense but yet another way of funneling N'Genuity funds to Defendant Bowen thus reducing the value of Jackson's equity interest.

Third, absolutely no legitimate business purpose is served by hiring UAE to provide

---

[4] Ex. DD is a copy of Michael Pakter's Affidavit summarizing his analysis of N'Genuity's post-confirmation QuickBooks. Pakter's schedules include copies of N'Genuity's QuickBooks general ledgers that N'Genuity alleges constitutes confidential information. Jackson disagrees. Until the matter is resolved, Jackson will not file Mr. Pakter's Schedules with the Clerk, but will include them in the Court's courtesy copy.

marketing services to N'Genuity when in fact its owner, Defendant Bowen, owns a competing food export company - N'Genuity Food Exports. (Ex. R.) N'Genuity's annual revenues – stable for the previous four years – suddenly dropped almost $10 million in the year following Bowen's formation of N'Genuity Food Exports. (Compare Ex. S and T.)

Fourth, the N'Genuity – UAE agreement is the result of a conflicted director transaction and thus void. On April 13, 2012 (just days following the departure of the Trustee) N'Genuity, through Littlechief, and UAE, through her husband, Defendant Bowen signed a "contract" wherein N'Genuity agreed to pay UAE $2,500 biweekly. (Ex. G, pp.75-79.) On April 27, 2012, N'Genuity made its first payment to UAE (Ex. DD, Schedule 1) even though UAE was not incorporated until April 30, 2012. (Ex. CC.) This contract between two family members constitutes a conflicted director transaction and required the approval of a non-conflicted director or shareholder. A.R.S. §10-860 and 10-862. The "contract" serves no legitimate purpose for N'Genuity as there isn't a single performance measure built into the written agreement, a fact Defendant Bowen has already admitted. Under the agreement, N'Genuity is obligated to pay him/UAE $2,500 every other week regardless of whether Bowen "comes into the office or not" and regardless of whether UAE generates any business for N'Genuity. (Ex. H, p. 154.) Accordingly, the contract is unfair to N'Genuity and subject to being set aside. A.R.S. §10-861.

Even if the contract were legitimate, the parties have abandoned it. The contract requires N'Genuity to pay UAE $2,500 biweekly. From January 31, 2014 to April 25, 2014, N'Genuity paid UAE $186,643.63 which averages approximately $31,000 biweekly. Under Arizona law, "[w]here the acts of one party inconsistent with the existence of a contract are acquiesced in by the other, the contract will be treated as abandoned. *King Realty*, 4 Ariz. App. at 81, 417 P.2d at 715 (1966) (citing 17A C.J.S. Contracts § 389).

According to the recently produced QuickBooks, on top of paying Bowen through UAE, N'Genuity also directly paid him $29,608.96. (Ex. DD, ¶14.) This figure is more than triple the amount reported to Simon. Based on the dated information that Simon had, N'Genuity had paid Defendant $9,425: $6,750 in March 2013 and $2,675 in April 2013.

(Ex. G, p.89, 102-03.) Simon Consulting asked Dustin Bowen to justify these payments. Dustin alleged that N'Genuity paid his father $6,750 for "tax and litigation preparation services" (Ex. G, p. 103) although Defendant Alfred Bowen is neither an attorney nor an accountant. Dustin paid an additional $2,675 to Defendant Bowen, because his father asked him to. (Ex. G, p. 103.)

Littlechief has justified payments to UAE on the grounds that the payments are deducted from her salary and do not "affect the business, per se. It just only affects me personally." (Ex. I, p. 184.) Littlechief, however, has received a substantial amount of money post-confirmation. Since confirmation, N'Genuity has paid her at least $323,865. (Ex. DD, ¶21.) The $302,043.63 of payments to UAE have obviously not been deducted from her salary, are not accounted for as deductions from her salary in N'Genuity's books, and exceed both the amount due under the UAE contract ($2,500 bi-weekly) and Littlechief's maximum post-confirmation salary ($480,000[5] is less than $302,043.63 [payment to UAE] + $323,865 [payment to Littlechief]).

Moreover, if indeed payments to UAE constituted a legitimate N'Genuity business expense then: (1) there would be no need to "deduct" payments from Littlechief; (2) there would be an arms' length agreement between the companies approved by a non-conflicted director or shareholder; (3) N'Genuity would pay UAE according to the terms of its contractual agreement; and (4) N'Genuity would have produced evidence of what UAE actually does when asked to do so by Simon.

On April 23, 2014, N'Genuity's counsel told this Court that Judge Nielsen addressed the propriety of payments to UAE in the proof of claims trial. This is not true – the issue of whether N'Genuity improperly paid UAE was not before the court and certainly not adjudicated. Jackson premised his Proof of Claim and Amended Proof of Claim on the First Amended Complaint filed in *N'Genuity I* on May 20, 2011; at least a year before N'Genuity made payments to UAE. No party raised the propriety of payments to UAE as in issue in its post-trial briefs. Indeed, neither Defendant Bowen nor UAE were parties

---

[5] This assumes the Littlechief's salary remained at $240,000 per year, but Jackson only agreed to this salary level for the first year of post-confirmation operations. That was before Judge Nielsen's findings indicating that Littlechief did not perform the actual role of a CEO. Needless to say, Jackson does not believe that Littlechief's salary is appropriate given her demonstrated lack of actual work. For example, Jackson would have voted against paying Littlechief a $25,000 bonus in 2013 – a year the company's sales dropped almost 30%. (Ex. J.)

before Judge Nielsen. At trial, Littlechief was cross-examined regarding payments to UAE only as it related to her credibility. Indeed, when Mr. Clemency objected on the grounds of relevancy to questions about UAE, Jackson's attorney, recognizing that the trial was limited to review of Jackson's pre-petition claims stated, "[w]e're not offering it to show that payments to UAE prepetition were improper". (Ex. U, p.69.) Rather, whether Littlechief authorized payments to a related company in violation of the preliminary injunction order entered by Judge Cole and adopted by Judge Nielsen went to the issue of her credibility. (*Id.*) On those grounds, the Bankruptcy Court overruled the objection and never addressed the propriety of N'Genuity's payments to UAE in its final ruling but did include testimony regarding UAE in its recitation of the testimony presented. (*See,* Ex. B, p. 6.)[6]   At no time did the Bankruptcy Court rule that payments to UAE were proper or improper as the parties never presented that issue to the court.

### 2. Payments to Urner Barry (a debt of IMG).

N'Genuity improperly paid Urner Barry $9,999 post-confirmation. (Ex. DD ¶24, Ex. G, p. 104.) Urner Barry is not, however, an N'Genuity expense.  It is an expense that N'Genuity's own financial consultant, MCA, reviewed and concluded, "should be paid by IMG", not by N'Genuity. (Ex. G, p.16.) N'Genuity does not own IMG; Defendant Bowen's sons do.

### 3. Other Improper Payments to Defendant Bowen's relatives

N'Genuity improperly paid Rae Lamb $5,000 post-confirmation. (Ex. DD, ¶23, Ex. G, p. 104.) Rae Lamb is Littlechief's mother and "has not worked outside the home since Ms. Littlechief was ten years old."  (Ex. B, p.5.)  N'Genuity failed to produce documentation demonstrating the propriety of this payment to Simon. (Ex. G, p. 104.) Post-confirmation, N'Genuity also paid $8,022.43 for food and travel expenses to Littlechief and Dustin Bowen that, despite requests from Simon, lacked either supporting receipts and/or evidence of a business purpose.

**B. Absent Court intervention, N'Genuity continues to refuse Mr. Jackson full and complete access to its books and records, including its attorney billing records.**

---

[6]  In it's decision, the Bankruptcy Court noted payments to UAE and summarized Littlechief's testimony that she believed that Judge Cole's preliminary injunction order was superseded by the bankruptcy filing. The Bankruptcy Court then concluded, by footnote, that this appeared to be a discovery issue; *see,* Ex. B, p. 19 where the Court referred to UAE when summarizing Littlechief's "resumed" testimony; and *see* Ex. B, pp. 24-25 where the Court referred to UAE when summarizing Littlechief's cross examination testimony.)

N'Genuity has demonstrated a stubborn refusal to provide Mr. Jackson the critical information to which he is lawfully entitled as a 49% shareholder. It has done so, under the control of Defendant Bowen, in order to conceal the large amounts of money being funneled to Defendant Bowen and related entities. At the same time it declined to produce the records, N'Genuity has asserted that its Chapter 11 case could be turned into a Chapter 7 case due to Jackson's litigation. N'Genuity's position goes beyond mere Chutzpah and evidences an intent to deceive.

Since confirmation, despite having agreed to permit Simon Consulting to examine its books and records on a monthly basis, N'Genuity refused inspections from November 2011 to February 2012 and again from June 2013 through October 2013. (Ex. G, pp.4-8.) Jackson has made repeated requests for an electronic copy of N'Genuity's QuickBooks accounting records that N'Genuity. Jackson made these requests in writing on October 3, 2013, February 15, 2014 and February 19, 2014 and also asked for copies of G&K's billing statements. (Ex. K-M.) N'Genuity refused. (Ex. N-O.) Because N'Genuity had previously alleged that its customer names and pricing constituted confidential information, Jackson suggested it redact that information,[7] delineate the redactions and provide an accompanying privilege log. (Ex. K-M.) N'Genuity refused. (Ex. N-O.) Nevertheless, before the Bankruptcy Court on April 22, 2014, Mr. Clemency asserted that Jackson demanded QuickBooks in its "native format" and that he agreed to an inspection of the books. (Ex. P, p.23.) That is not true. Rather, N'Genuity offered to "schedule an inspection of the *appropriate records* at the N'Genuity offices" (emphasis added). (Ex. O.) When Jackson asked for clarification as to whether an inspection at N'Genuity's office would include an examination of its QuickBooks and G&K billing statements, counsel for N'Genuity failed to respond.[8]

---

[7] Jackson does not concede that this information is confidential; it is not. N'Genuity customers are of public record as N'Genuity identified them in open court during the trial on Jackson's proof of claim in Arizona. QuickBooks is an accounting software package. There is nothing inherently "confidential" about this accounting data. Jackson offered to accept the data without the customer names and pricing as a compromise but N'Genuity persists in its refusal. N'Genuity's suggestion that Jackson will somehow damage the company using "insider-type" is ironic given Defendant Bowen's formation of a competing business.

[8] N'Genuity is likely to respond that it would have "allowed" Simon Consulting to view the QuickBooks for Mr. Jackson. The Arizona Business Corporation Act does not allow N'Genuity to dictate how Mr.

On April 27, 2014, Mr. Clemency reiterated N'Genuity's refusal to produce an electronic copy of its QuickBooks but said that Jackson was welcome to come to N'Genuity's offices for an inspection. (Ex. V, p. 21.) This Court urged the parties to discuss the issue further. (*Id.* at p.22.) On April 30, 2014, Jackson's counsel sent Mr. Clemency an email asking if would reconsider his earlier refusal to produce the QuickBooks and offered to further discuss the issue by phone. (Ex. W.) N'Genuity never responded. On May 20, 2014, this Court ordered N'Genuity to provide Jackson with an electronic copy of its QuickBooks by May 27, 2014. But for this Court's intervention, N'Genuity would not have turned over its books and Jackson would never have known of the continued insider dealing that is, once again, rendering the company profitless.

**C. N'Genuity's payment of unnecessary and improper legal fees.**

Over Jackson's objections, N'Genuity paid for the legal defense of Defendant Bowen in *N'Genuity I* and refused to produce evidence of amounts N'Genuity paid in legal fees. (Ex. A, at *47.) In this case, N'Genuity refused to provide Jackson information regarding the amounts paid to its counsel, Gallagher & Kennedy, and the basis for its legal expenses. The court ordered production of QuickBooks shows why: since confirmation, N'Genuity has paid Gallagher & Kennedy almost $1 million in fees to advance legally unsound and unreasonable motions such as an attempted removal of this case to the Arizona bankruptcy court [Dkt. #9]; a motion filed in Arizona to enjoin Jackson from pursuing his Motion for an Award of Attorneys Fees in *Jackson v. N'Genuity*, 09cv6010 [Dkt. #484] despite Judge Nielsen's clear directive that Jackson make the request of this Court (motion denied by Judge Nielsen on June 3, 2014); a motion filed in Arizona to enjoin this Court from considering Jackson's post-confirmation claims against N'Genuity [Dkt. #1] (motion denied by Judge Nielsen on June 3, 2014); and its representation of Alfred Bowen even though Gallagher & Kennedy claims he is not a director or employee of N'Genuity and that they have not been retained to represent Defendant Bowen. These baseless claims are a waste of N'Genuity funds and designed solely to harass Mr. Jackson.

---

Jackson views the corporation's accounting records. Of course Simon Consulting could view the data. But, providing Mr. Jackson with a copy of the data on a thumb drive (about $15-$30) if far more cost and time efficient than paying Simon to review the data and produce a written report summarizing all of the information viewed and its conclusions.

Neither Quarles & Brady nor Gallagher & Kennedy should be simultaneously representing both N'Genuity and Defendant Bowen, as it is plain that the company's interests diverge from those of Defendant Bowen. N'Genuity's QuickBooks show the payment of a $10,000 retainer to Quarles & Brady. (Ex. DD, ¶26.) And, Gallagher & Kennedy should not be representing Alfred Bowen on N'Genuity's dime.[9]

## IV. LEGAL AUTHORITY WARRANTING INJUNCTIVE RELIEF

A defendant's past intentionally deceptive, bad faith conduct is indicative of a "high probability that, absent a preliminary injunction, the defendants would engage in further acts designed to defraud [the plaintiff] and frustrate any enforcement of any judgment the Court might enter. *Caterpillar, Inc. v. Jerryco Footwear*, 880 F. Supp. 578, 586-589 (C.D. ILL 1994). Here, Defendants' "past intentionally deceptive, bad faith conduct" is well documented in Judge Cole's Preliminary Injunction Order and the Bankruptcy Court's Judgment. (Ex. A, B.) Judge Cole found that Defendants' discovery abuses in *N'Genuity I*, were the "second worst" that he has seen as a judge, and the Arizona Bankruptcy court concluded that N'Genuity "through its insiders worked a significant harm and appreciable injustice on the minority shareholder by their actions…". These findings coupled with Defendants' continued misconduct warrant injunctive relief.

A party seeking a preliminary injunction must demonstrate (1) its case has some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of The United States of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008). The court must then balance, on a sliding scale, the irreparable harm to the moving party with the harm an injunction would cause to the opposing party. *Id.* at 1086.

---

[9] Section10-851 of the Arizona Business Corporation Act bars N'Genuity from paying for his legal expenses unless Defendant Bowen (1) is a director of N'Genuity, (2) has acted in good faith *and* (3) has furnished the corporation with a written agreement to repay the advance of legal fees if it is ultimately determined that he is not entitled to indemnification or that he did not meet the appropriate standard of conduct. A.R.S §10-851. (Defendant Bowen has testified inconsistently as to whether he is a director.) The indemnification section of the Act applies to Directors, not agents. *First Interstate Bank of Arizona, NA v. Murphy, Wier & Butler,* 210 F.3d 983, 990 (9th Cir. 2000). Thus, unless Bowen has become a director since April 22, 2014, N'Genuity cannot satisfy the first element of the Act. Nor could it satisfy the second, since the transaction that Jackson complains of is a conflicted transaction that is plainly unfair to N'Genuity. Paying for Defendant Bowen to do work already being performed by his sons – and while he may be operating a competing business – is not fair to N'Genuity. Finally, there is no evidence Defendant Bowen has agreed to provide an indemnification to N'Genuity.

The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Abbott Laboratories v. Meade Johnson,* 971 F.2d 6, 12 (7th Cir. 1992). Where appropriate, the balancing process must also consider the public interest in granting or denying the preliminary injunction. *Girl Scouts of Manitou,* 549 F.3d at 1086. Finally, in determining whether to grant injunctive relief, the district court must consider these factors and "exercise its discretion 'to arrive at a decision based on the subjective evaluation of the import of various factors and a personal, intuitive sense about the nature of the case.' [Citations omitted.]" *Id.*

**A. Mr. Jackson Is Likely To Succeed On The Merits.**

Mr. Jackson has filed a four count Complaint against defendants N'Genuity and Alfred Bowen: Count I, violation of the Arizona Business Corporation Act §§10-1602 for N'Genuity's refusal to provide Mr. Jackson with its accounting records; Count II, Breach of Fiduciary Duty by Alfred Bowen, N'Genuity's acting director and CEO, for the use of N'Genuity funds as his own; Count III, a request for the appointment of a temporary receiver; and Count IV, injunctive relief. [Dkt. #1.] The threshold for showing a likelihood of success on the merits "is low." *Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir. 1999). A plaintiff need only demonstrate a better than negligible chance of succeeding on the merits. *Id.* Plaintiff is likely to succeed on each of these counts.

### 1. Plaintiff's likelihood of success on Count I:  Violation of the Arizona Business Corporation Act, §10-1602

Mr. Jackson is a 49% shareholder. See *Jackson v. Littlechief Specialties* [09cv6010, Dkt. #471, ¶11]; and Ex. B, p. 102. As such he is entitled to review, *inter alia*, "the accounting records of the corporation" pursuant to the Arizona Business Corporation Act, A.R.S. §10-1602(B)(2). N'Genuity's refusal to produce an electronic copy of its accounting records or to respond to Jackson's inquiries regarding the scope of a physical inspection at is offices constitutes a violation of the Act.

### 2. Plaintiff's likelihood of success on Count III:  Breach of Fiduciary Duty

Under Illinois conflict of law principles, the law of the state of incorporation controls as to the duty owed by a corporate official to his corporation. *Jackson v. N'Genuity,* 2010 WL 4628668, fn 4 (ND ILL. 2010) citing, *Libco Corporation v. Roland,* 99 Ill. App. 3d, 1140, 144 (4th Dist. 1981) and *Abbott Labs v. Takeda Pharmaceutical*

*Co., Ltd.,* 476 F.3d 421, 425 (7th Cir. 2007). In Arizona, a director of a corporation owes a fiduciary duty to the corporation and its stockholders. *Dooley v. O'Brien,* 226 Ariz. 149, 244 P.3d 586, 590 (1st Div. 2010). "This duty is in the nature of a trust relationship requiring a high degree of care on the part of the director." *Dooley,* 244 P.3d at 590. A corporate director has a duty of loyalty that "springs from the prohibition against self dealing that is inherent in a director's fiduciary relationship with the corporation and its shareholders." *Schoen v. Schoen,* 167 Ariz 58, 804 P.2d 787, 794 (Az. App., 1990). Where a director is personally interested in the corporate transaction, the business judgment rule does not apply. *Schoen v. Schoen,* 804 P.2d 787, 794. The fiduciary relation of the corporate officers imposes upon them the obligation to serve the purpose of their trust with fidelity and forbidding the doing of any act by which assets of the corporation are wrongfully diverted from corporate purposes. Ex. A at *24-25 citing *Master Records, Inc., v. Backman*, 133 Ariz. 494, 652 P.2d 1017, 1022 (Ariz. 1982).

### a. *Alfred Bowen is an acting director and thus owes a fiduciary duty to N'Genuity and its shareholders – including Mr. Jackson.*

Defendant Bowen has previously held himself out as a Vice President of N'Genuity to the United States Department of Agriculture Livestock and Feed Program. Ex. A at *33-34. Alfred Bowen also filed a document with the IRS on behalf of N'Genuity stating that he had the authority and power to grant power of attorney for N'Genuity. *Id* at *34. N'Genuity officially identifies only Valerie Littlechief and Dustin Bowen as its directors, however, the Bankruptcy Court found that neither Littlechief nor Dustin Bowen were familiar with the company's basic affairs, "routine financial and account records and procedures of the company." (Ex. B, pp. 16, 30-31, 49) The evidence overwhelmingly suggested that Defendant Bowen "actually directed" N'Genuity, with the assistance and cooperation of his wife and son. Defendant Bowen has an office at N'Genuity and full access to N'Genuity's computerized network and records. Ex. B p. 40. Defendant Bowen, not Dustin and not Valerie, created N'Genuity's "structure, contacted debtor's [N'Genuity's] first manufacturing vendor and managed litigation once it began." *Id.*

Defendant Bowen confirmed that he acts as an N'Genuity director during a recent deposition conducted by the IRS on December 13, 2013. While represented by Lindsi Weber of G&K, who during the deposition, cautioned Defendant Bowen not to reveal

any "confidential" information exchanged between N'Genuity's attorneys and Defendant Bowen, Defendant Bowen admitted that he:

- Assisted Littlechief with "anything that's got to do with just ongoing work on a daily basis or at least a weekly basis, decisions that had to be made, what was the company going to pursue as far as customers, worked very hard to get socioeconomic certifications." (Ex. Q, p. 8.)

- In assisting Littlechief he not only advised her, but performed the actual work to carry out his recommendations. (*Id.,* p. 8.)

- He was responsible for the "big picture strategy, planning, that kind of thing" for N'Genuity and "assist[ed] in actually pursuing some of the decisions" made by him and Littlechief. (*Id.,* p. 9.)

- Assisted his sons in their work for N'Genuity because "they had never been in that business. They had never been involved in anything. They were getting out of college and I spent a great deal of time with them and had them get involved in what was going on and watching, looking and coming up with *their own* ideas." (Emphasis added.) (*Id.,* p. 10.)

- Defendant Bowen admitted that he directed N'Genuity by telling Dustin and Chad Bowen "here is what we're going to do, here is how we're going to do it." (*Id.,* p. 11.) "…we went through things on a daily basis or at least very, very regular." (*Id.,* p. 11.)

- Defendant Bowen would say, "Chad, you do this and, Dustin you do this. Bo, and you, Valerie, are going to do this. You know, they would get things [from Defendant Bowen] they were supposed to do. They had responsibilities, but it was pretty minimal back then, obviously." (*Id.*)

- After the Defendant N'Genuity grew, Defendant Bowen continued to advise Dustin and Chad. *Id.* at 12. Defendant Bowen also confessed, "I spent a great deal of time looking through all the available things that she [Littlechief] could – that could be provided to her which would increase sales. And I did a lot of that face to face with the government, face to face with the buyers." (*Id.,* p. 12-13.)

- Defendant Bowen would "go in the office and not even know what [he] was going to do." (*Id.,* p. 17.) He admitted that, "I'd go in there, if there was a problem, I would deal with the problem. I would help Valerie deal with the problems. I would help those guys [Dustin and Chad] deal with the problems. Valerie didn't help them deal with their problems. I did that." (*Id.,* p. 17.) Like most directors and officers, there was no specific time that Defendant Bowen was supposed to appear at the office or task

that he was supposed to do – he would just take on projects he thought necessary. (*Id.,* p. 18.)

- On occasion, like a director or officer, Defendant Bowen had the authority to and did in fact tell the bookkeeper "that this is not categorized properly." (*Id.,* p. 21.)

- Defendant Bowen worked with N'Genuity's accountants and/or auditors in preparing N'Genuity's tax returns and in transmitting them information (*Id.,* p. 22); answering their questions (*Id.,* p. 23); and explaining journal entries in N'Genuity's accounting records. (*Id.,* p. 25.)

- Defendant Bowen prepared N'Genuity's profit analysis. (*Id.,* p. 25.)

- Defendant Bowen traveled overseas for N'Genuity. According to him: "Once I got there, we would fly to different destinations to see certain issues that they might be having. I would give them some, 'Here. Here is an option. Here is how we can take care of that for you as long as you buy the product from us and we're going to do this,' and there was a lot of that." (*Id.,* p. 51.)

- Defendant Bowen was very involved "in working with Lindsi [Weber]", N'Genuity's counsel for the "Jackson situation." (*Id.,* p. 22.)

Perhaps the most telling evidence confirming that Defendant Bowen is in charge of N'Genuity, is when asked why N'Genuity paid Defendant Bowen $2,675, Dustin Bowen only response was that his father told him to.

Defendant Bowen acts as a director of N'Genuity. "It is settled that de facto directors have the same fiduciary duties as de jure directors. A de facto officer may not exercise the prerogatives of a corporate position and yet avoid its attendant fiduciary duties and liabilities." *In re Globe Drug Co.,* 104 F.2d 114, 117 (9th Cir. 1939); *see also Air Technical Development Co. v. Arizona Bank*, 101 Ariz. 70, 72, 416 P.2d 183, 195 (1966) (holding corporation was estopped to deny actions of husband and wife directors who owned majority of corporate stock in effort to defeat loan) (cites omitted)). As such, he owes the company and its shareholders a fiduciary duty. Defendant Bowen breached his duty of loyalty to N'Genuity and to Mr. Jackson as a shareholder when he acted in furtherance of his and his family's best interests at the expense of the company and Mr. Jackson.

**B. Mr. Jackson Will Suffer Irreparable Harm For Which There Is No Adequate**

**Remedy At Law.**

The lack of an adequate remedy at law is shown where, as here, monetary damages would be seriously deficient as a remedy for the harm suffered. *Roland Machinery Company v. Dresser Industries, Inc.,* 749 F.2d 380, 386 (7th Cir. 1984). A damages remedy may be inadequate if the nature of the plaintiff's loss may make damages difficult to calculate. *Roland,* 749 F.2d 380, 386. This same principle applies in the context of irreparable harm. *Id.* Thus, the question of whether a plaintiff has an adequate remedy at law is closely tied to whether the plaintiff will suffer irreparable injury if an injunction is not issued. *Wilbert Funeral Services, Inc., v. Wilbert of Birmingham, LLC,* 2009 WL 3617532 *6 (N.D.Ill. 2009).

Jackson will suffer irreparable harm if N'Genuity is allowed to refuse to produce its QuickBooks data to Jackson. The only way for Jackson to assess the value of his rightful 49% interest and prevent further unlawful dissipation of his asset is for him to view N'Genuity's accounting records.

Jackson will also suffer irreparable harm if N'Genuity continues to pay for the legal defense of Alfred Bowen while it simultaneously allows him to loot the company. Irreparable harm is defined as "harm that cannot be prevented or fully rectified by the final judgment after trial." *Roland,* 749 F.2d 380, 386. As Judge Cole previously held, "[a]bsent an injunction to prevent further looting of the company, any monetary award Mr. Jackson might receive in connection with his claims for fiduciary breach might prove uncollectible, thereby making 'inadequate' the remedy. Inadequacy does not mean 'wholly ineffectual; [it] mean[s] seriously deficient as a remedy for the harm suffered.' *Roland Machinery Co., v. Dreser Industries, Inc.,* 749 F.2d 380, 380 (7th Cir. 1984). Accord *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)." *84, 85." Such is the case at bar – again.

"Where the only remedy sought at trial is damages, the two requirements – irreparable harm, and no adequate remedy at law – merge." *Roland,* 749 F.2d at 386. The question, then, is whether the plaintiff will be made whole if he prevails on the merits and is awarded damages. *Id.* A damage remedy can be inadequate where "damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." *Id.* at 386. If N'Genuity continues

to dole out its funds to insiders, Jackson will not only suffer irreparable harm, but the remedy at law will be seriously deficient. *See, Roland* 749 F.2d 380, 386. Indeed, counsel for N'Genuity suggested that Jackson's litigation of his post-confirmation claims could make N'Genuity a Chapter 7 debtor at the most recent hearing in the Bankruptcy Court. (Ex. P, pp. 26-27.) N'Genuity's counsel may be right about the risk, but he is wrong about the cause. Throughout Jackson's litigation between 2009 and 2012, N'Genuity always maintained revenues in excess of $30 million. (Ex. S, p. EXC. 024.) Yet, according to N'Genuity's tax returns, in 2013, the year that Alfred Bowen formed N'Genuity Food Exports, N'Genuity's revenues declined to $22 million. (Ex. T.[10])

According to N'Genuity's financials statements, its profits have plummeted. Unless an injunction is issued, Jackson will continue to suffer irreparable harm.

## C. The Harm To Mr. Jackson Of Denying Injunctive Relief Outweighs The Harm To Defendants Of Granting It.

Once a plaintiff has made the required threshold showings, the court must then balance the harms involved. *Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir. 1999). Here, that balance weighs in favor of Mr. Jackson. The evidence demonstrates that Defendant Bowen continues to engage in the very type of self dealing that justified the October 3, 2011 Preliminary Injunction and the Bankruptcy Court's finding in favor of Jackson.[11] Defendants also continue to ignore their obligation to permit Jackson to see N'Genuity's financial records. Their continued willful and contumacious behavior, tips the scale in favor of Mr. Jackson.

## D. The Issuance Of The Preliminary Injunction Will Not Disserve The Public

The issuance of the preliminary injunction will not harm the public in any way. To the contrary, the public has an interest in companies being run in accordance with the law.

---

[10] Exhibit T is a copy of N'Genuity's Profit and Loss Statement for the year ending 2013. N'Genuity contends that this type of document is confidential. Jackson disagrees. Until the matter is resolved, Jackson will not file Ex. T with the Clerk, but will include the exhibit in the Court's courtesy copy.

[11] It is worth pointing out that immediately following N'Genuity's bankruptcy filing, N'Genuity took actions in violations of this Court's October 3, 2011 injunction. Those actions included "loans," i.e., cash advances of $23,345.57 to Valerie Littlechief and a $90,000 payment to IMG. Only the Bankruptcy Court's re-entry of this Court's October 3, 2011 injunction and the appointment of a Chapter 11 Trustee prevented further dissipation by N'Genuity's insiders.

### V. N'GENUITY'S DISCHARGE INJUNCTION DOES NOT PROHIBIT THIS COURT FROM ISSUING A PRELIMINARY INJUNCTION AGAINST N'GENUITY OR ALFRED BOWEN

N'Genuity is likely to reassert that its bankruptcy discharge injunction bars Jackson's complaint for post-confirmation misconduct. This is incorrect. As a threshold matter, the Bankruptcy Court denied N'Genuity's recent motion to enforce the discharge injunction to prevent this lawsuit from going forward. (The Bankruptcy Court's decision will be provided as a supplemental exhibit once it has been transcribed.) The primary basis for that decision was that (a) this Court had jurisdiction to evaluate the applicability of the discharge defense; and (b) the conduct targeted by Jackson was post-confirmation conduct not protected by the discharge.

This Court plainly has jurisdiction to address N'Genuity's discharge-based defenses. Determinations as to the applicability of the bankruptcy discharge are not matters uniquely within the bankruptcy court's 'core' jurisdiction. *See In re Birting Fisheries, Inc.*, 300 B.R. 489, 500 (9th Cir. B.A.P. 2003). Quoting an earlier Ninth Circuit decision, the Ninth Circuit Bankruptcy Appellate Panel (hereinafter the "Ninth Circuit BAP") in *Birting Fisheries* noted that, "a state court is not 'divested of all jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court,' but rather that a state court exceeds its jurisdiction if it 'goes further.'" *Id.* (quoting *In re McGhan*, 288 F.3d 1172, 1180 (9th Cir. 2002)) (emphasis in the original). As the Ninth Circuit itself stated, "state courts have the power to construe the discharge and determine whether a particular debt is or is not within the discharge" because "discharge in bankruptcy is a recognized defense under state law." *McGhan*, 288 F.3d at 1180 (quoting *In re Pavelich*, 229 B.R. 777, 783 (9th Cir. B.A.P. 1999)).[12] The Bankruptcy Court

---

[12] In the *McGhan* decision, the Ninth Circuit spoke directly about an earlier Ninth Circuit decision, *Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074 (9th Cir. 2000), which held that a state court does not have the jurisdictional authority to modify the automatic stay in 11 U.S.C. § 362. Quoting approvingly from an earlier Arizona bankruptcy court decision, the *McGhan* court noted, "*Gruntz* should not be read to mean that states lack jurisdiction to determine the applicability of either the stay or the discharge, but only that they lack jurisdiction to modify either of them[.]" 288 F.3d at 1180 n. 10 (quoting *In re Lenke*, 249 B.R. 1, 8 (Bankr.D.Ariz. 2000)). Jackson does not

expressed confidence in this Court's ability to appropriately evaluate the applicability of the discharge defense.

It is clear that N'Genuity's discharge does not apply to Jackson's claims. The discharge injunction provided by 11 U.S.C. §524 covers only pre-confirmation claims. *See* 11 U.S.C. § 1141(d)(1)(A); *U.S. Commodity Future Trading Commission v. NRG Energy, Inc.*, 457 F.3d 776, 779-80 (8th Cir. 2006) (discharge injunction does not affect future, post-confirmation conduct). Because Jackson's complaint (and this motion) expressly seeks recovery for only post-confirmation conduct, his claims cannot be barred by the discharge injunction. Moreover, Jackson's complaint seeks only equitable relief from N'Genuity: the production of N'Genuity's books and records, the appointment of a receiver, and an injunction barring N'Genuity from allowing its insiders from using its funds as its own. Because Jackson's request for injunctive relief is based upon future conduct, it cannot be barred by the discharge injunction. *See CFTC v. NRG Energy*, 457 F.3d at 780 (noting that "[b]ecause the injunction itself would only restrict NRG from committing future acts, this enforcement action is not a claim for purposes of § 101(5). *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985); *In re Udell*, 18 F.3d 403, 409-10 (7th Cir.1994)).

In the Bankruptcy Court N'Genuity asserted that Jackson's complaint sought relief for pre-confirmation debts. This is not true. Jackson's complaint makes the following claims – each of which is related to conduct that occurred ***after*** the April 4, 2012 confirmation of N'Genuity's bankruptcy plan. Jackson complaint alleges that N'Genuity has refused to provide corporate records required under Arizona law – ***after*** N'Genuity's bankruptcy plan was confirmed. The dates of Jackson's requests (as set forth in the complaint) are: February 20, 2013, October 3, 2013, October 18, 2013, and February 15, 2014. *See* Dkt. #1 at ¶¶ 50 & 53, 68; 88. Jackson's complaint also alleges that Alfred Bowen and N'Genuity transferred money to Alfred Bowen, Bowen's companies, Bowen's family members, and paid obligations of IMG[13] ***after*** the confirmation of

---

seek to modify the discharge. Instead, Jackson asserts that the discharge does not apply because his complaint attacks only post-confirmation misconduct.

[13] As set forth in Jackson's complaint, N'Genuity's own expert observed that these payments should have been made by IMG.

N'Genuity's bankruptcy plan. These acts occurred starting on April 13, 2012 (with N'Genuity's unauthorized entry into a contract with Alfred Bowen's entity UAE) and continued through at least the end of 2013. Such payments include: (1) $98,600 in payments to UAE between April 26, 2012 and September 27, 2013 (paragraph 65 of Jackson's complaint) – we now know this figure is over $300,000 due to post-confirmation payments between September 2013 and May 2014; (2) over $9,000 in payments directly to Alfred Bowen in March and September of 2013 (paragraphs 70 and 72 of Jackson's complaint) – we now know this figure is over $29,000; (3) post-confirmation payments to Urner Barry – an expense of IMG, not N'Genuity; and (4) a $5,000 August 2013 payment to Rae Lamb. As specifically set forth in Jackson's complaint, each of these payments or transfers occurred **after** N'Genuity's April 4, 2012 confirmation. *See id.* at ¶¶ 58-84.

Jackson took extraordinary steps to make clear that he was not seeking to violate the discharge injunction. Indeed, to avoid distraction from this non-issue, Jackson's complaint specifically acknowledged that N'Genuity's pre-confirmation misconduct has been discharged:

> The Bankruptcy Court confirmed N'Genuity's bankruptcy plan on April 4, 2012. The confirmation of the plan discharged N'Genuity from all debts arising prior to confirmation. *See* 11 U.S.C. § 1141. This Complaint does not seek to hold Defendant Bowen or N'Genuity responsible for N'Genuity's and Bowen's many, many violations of this Court (and the Bankruptcy Court's) orders *prior* to N'Genuity's confirmation. These facts are relevant, however, because they establish that N'Genuity and Defendant Bowen cannot be trusted to obey the lawful directives of any court. N'Genuity's confirmation does not discharge the Company for any actions occurring after its confirmation. *See* 11 U.S.C. § 1141(d)(1).

*See* Jackson's Complaint, [Dkt. #1, ¶44.]

Of course, it is completely clear *N'Genuity's* Chapter 11 discharge does not and cannot prevent this Court from adjudicating Jackson's claims against Defendant *Bowen*. *See* 11 U.S.C. § 524(e). No such discharge is provided for under N'Genuity's confirmed plan. Moreover, under applicable Ninth Circuit law, N'Genuity's plan could not have discharged Alfred Bowen, a non-debtor. *See Stratosphere Litigation LLC v Grand Casinos, Inc*, 298 F 3d 1137 (9th Cir 2002) (bankruptcy court cannot confirm a plan that discharges a non-debtor); *American Hardwoods, Inc v Deutsche Credit Corp*, 885 F 2d

621 (9th Cir 1989) (same).

N'Genuity may also argue that because Jackson pointed out that improper payments were being made in his requests to obtain N'Genuity's financial records, in the Bankruptcy Court, that the Bankruptcy Court approved these transactions. This is plainly not the case. The Bankruptcy Court only ruled on one of Jackson's two motions to enforce the agreed upon inspection regime. That motion did not seek a ruling regarding the validity of any of these post-confirmation transactions. (Ex. Y, p. 5.) Further, the February 19, 2013, order on Jackson's motion did not "ratify" any of the transactions. (Ex. AA.) Nor could it have with respect to most of the allegations in Jackson's new complaint because: (a) Jackson was not aware of many of these facts, *see* Jackson's first motion to enforce confirmation order regarding inspections (Ex. Y and BB); and (b) the misconduct occurred after February 19, 2013 (the date of the Court's only order on these issues). Jackson did not ask, and the Bankruptcy Court did not rule, on whether N'Genuity's post-confirmation payments to UAE and other Bowen-insiders were legally appropriate.

Finally, N'Genuity's conduct prior to Jackson's filing of the complaint belies its recent claim that the conduct alleged is discharged. By letter dated October 10, 2013, Mr. Jackson advised N'Genuity of much of the post-confirmation misconduct alleged in the Complaint and asked N'Genuity if it intended to pursue any of the claims pursuant to A.R.S §10-742. (Ex. X.) N'Genuity did not respond by alleging that these infractions were discharged. Indeed, N'Genuity did not respond at all to this letter. Had N'Genuity truly believed that the claims of misconduct were discharged, surely it would have said so.

## VI. LEGAL AUTHORITY WARRANTING APPOINTMENT OF A RECEIVER

Appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles. *Aviation Supply Corp., v. RSBI Aerospace, Inc.,* 999 F.2d 314, 316 (8th Cir. 1993), *See also, Jackson v. N'Genuity* at *25-26. Federal courts have an inherent equitable power to appoint a receiver. *In re McGaughey,* 24 F.3d 904, 907 (7th Cir. 1994). "It is an especially appropriate remedy in cases involving fraud and the possible dissipation of assets, since the primary consideration in determining whether to appoint a receiver is the need to protect, conserve and administer property

pending final disposition of a suit."  (Ex. A at *25, citing *In re McGaughey,* 24 F.3d at 907.)

There is no precise formula for determining when a receiver may be appointed. *Aviation Supply Corporation,* 999 F.2d 314, 317. As this Court previous noted:

> The courts are in agreement that the highly discretionary nature of the appointment of a receiver is inconsistent with any formulaic or algorithmic method for determining when the appointment is appropriate. It is not a necessary prerequisite to the appointment of a receiver that any particular condition be shown, such as insolvency of the defendant or any other status...Rather, the district court must take into account "all the circumstances of the case," *Connolly v. Gishwiller,* 162 F.2d 428, 435 (7th Cir. 1957), instead of attempting to rely on a "precise formula" for making the determination. "[N]o one factor is dispositive." *Canada Life Assur. Co. v. LaPeter,* 563 F.3d 837, 845, 848 (9th Cir. 2009).

(Ex. A at * 87.)

Several factors that have been considered in the decision to appoint a receiver include the following:  (1) fraudulent conduct on the part of the defendant; (2) the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (3) the inadequacy of the available legal remedies; (4) the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and (5) the plaintiff's probable success in the action and the possibility of irreparable injury to his interest in the property.  Ex. A at *9 citing *Consolidated Rail Corp. v. Fore River Ry. Co.,* 861 F.2d 322, 326-27 (1st Cir. 1988) and *Aviation Supply Corp.,* 999 F.2d 314, 316-17.

The facts demonstrating the necessity for injunctive relief as set forth above weigh in favor of appointment of a Receiver: N'Genuity has poured out approximately $1.1 million in "marketing" expenses, $990,000 to fight Jackson, and in the process has rendered N'Genuity profitless. Its woeful lack of proper management that, according to its counsel, is leading it into bankruptcy and the undisclosed and unauthorized insider transactions, which on their face appear grossly unfair to the company and the minority shareholder, warrant the appointment of a receiver.

As Judge Nielsen noted, neither of Defendant's named directors (Littlechief nor Dustin Bowen) have even a minimal understanding of the financial aspect of N'Genuity. N'Genuity completely lacks the internal controls necessary to prevent insider self-dealing

"[N]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior " by a corporate officer. (Ex. A at *25, citations omitted.) Frankly, Defendant Bowen, the acting head of N'Genuity, has not and cannot meet this standard of behavior.

Defendant Bowen's inability to act honestly is well documented in a number of published court orders and opinions. For instance, in *Genel Company, Inc. v. Cheryl Bowen and Alfred J. Bowen,* 198 B.R.551 (9th Cir. 1996), Defendant Bowen confessed to committing a fraud. As part of a loan transaction, Alfred Bowen, along with his then wife, Cheryl Bowen and their company, Bowen Quality, signed a pledge agreement for a security interest in stock to Genel. *Id.* at 553. Subsequently, Genel loaned the Bowens' company $1,053,000, paid in two installments on December 2, 1988 and on December 28, 1988. Two days after the final installment (December 30, 1988) the Bowens' company filed for Chapter 11 bankruptcy. *Id.* at 553. Genel sought to recover the pledged collateral but learned that the stock that Alfred Bowen pledged did not exist. *Id.* Genel sued. The parties settled the matter with Defendant Bowen and his wife agreeing to pay $875,000 and admitting to having obtained the loan under fraud and agreeing that the debt would not be dischargeable in bankruptcy pursuant to 11 USC § 523(a)(2)(B) and (a)(4).

In *The Resolution Trust Corporation v. Alfred and Cheryl Bowen,* 2008 WL 2001270 (Az, May 7, 2008), the plaintiff brought a two count complaint for breach of personal guaranties that Alfred and his former wife gave to secure promissory notes. The plaintiff obtained a default judgment. Alfred Bowen moved to set aside the default judgment arguing that he was never served with process. The court rejected Bowen's testimony as incredible and found that he had been personally served at his residence.

The judgment of $818,840.55 remained unsatisfied as of 2013 by which time Resolution Trust had assigned the judgment to the Cadle Company and the amount due and owing was in excess of $3,584,640.95. Though the Cadle debt was clearly not the debt of N'Genuity (and indeed incurred years before N'Genuity even existed) *N'Genuity,* over the objections of Mr. Jackson, recently settled with Cadle for $500,000.

In *Lavigne v. Chase, Haskell, Hayes & Kaloman,* 112 Wash.App.677, 50 P.3d 306 (Washington, 2002), Defendant Bowen brought a lawsuit against a law firm. With regard to the calculation of damages allegedly suffered by Defendant Bowen, the court

noted that: "An Arizona firm enlisted by Chase [defendant] to aid in the collection effort related that Al Bowen seemed to be hiding assets to escape creditors, possibly by transferring ownership to his brother Tom Bowen." *Lavigne v. Chase, Haskell, Hayes & Kaloman,* 112 Wash. App. 677, 680.

## VII. CONCLUSION

WHERFORE, Jackson respectfully requests that this Court enjoin Defendants, or anyone on their behalf, from:

a. Taking any action that dilutes or divests the value of Jackson's ownership interest in N'Genuity;

b. Paying, lending or transferring any of N'Genuity's funds or assets to Defendant Bowen;

c. Merging, paying, lending or transferring any of N'Genuity's funds or assets to any business entity, including without limitation UAE and N'Genuity Food Exports, in which Defendant Bowen or any his family members or relatives have any ownership interest, position or other affiliation; and

d. Using N'Genuity funds to pay for the legal defense of Alfred Bowen in this or any other matter.

WHEREFORE, Jackson also requests that this Court order:

a. Defendants to preserve all N'Genuity books and records;
b. Defendants to pay Plaintiff his attorney's fees and costs in bringing this motion;
c. Defendants to provide to Jackson an electronic copy of its QuickBooks data (or whatever accounting software program it uses) to date on a monthly basis by the fifth of each month;
d. Defendants to provide all attorney billing invoices from the start of G&K 's representation of N'Genuity and Alfred Bowen;
e. Permit the immediate inspection of N'Genuity's books and records by the accountant of Jackson's choice.
f. Permit discovery to commence immediately;
g. Appoint a Temporary Receiver; and
h. Any other relief this Court deems fair and just.

Respectfully submitted,
PLAINTIFF VINCENT E. JACKSON

By: ___*/s/ Kim Novi*_____
One of His Attorneys

Kim Novi, 6194228
**LAW OFFICE OF KIM NOVI**
22 W. Washington, Suite 1500
Chicago, Illinois 60602
312.750.9083
Email: kim.novi@att.net

Warren J. Stapleton, 018646,
**OSBORN MALEDON, P.A.**
2929 North Central Avenue
21st Floor
Phoenix, Arizona  85012-2793
(602) 640-9000
E-mail:   wstapleton@omlaw.com